In re E. T. RUSSELL CO., Inc.

(District Court, D. Massachusetts. June 29, 1923.)

No. 29018.

1. Bankruptcy ⚖⟳58—Payments by corporation of bills for current expenses held not "acts of bankruptcy."

Payments by an insolvent corporation within four months prior to filing of a petition in bankruptcy against it, on account of current expenses, such as renewal insurance premiums, salaries of officers, monthly bills for labor, and office supplies, etc., cannot be considered payments made with intent to give preferences, which constitute "acts of bankruptcy," under Bankruptcy Act, § 3a (2) (Comp. St. § 9587 [a(2)]).

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Act of Bankruptcy.]

⚖⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. **Bankruptcy ⬅⟹58—Payment to secured creditor held not act of bankruptcy.**

A payment by an insolvent to a secured creditor, where the value of the security exceeds the debt, is not a preferential payment, which constitutes an act of bankruptcy.

3. **Bankruptcy ⬅⟹58—Payments by insolvent in ordinary course of business, made in expectation of being able to continue and to pay all indebtedness, held not acts of bankruptcy.**

Payments by a corporation of current bills in the ordinary course of business, though it was in fact insolvent and the payments preferential, where made with the expectation that it would be able to continue and to pay its indebtedness in full, cannot be said to have been made with intent to prefer, which render them acts of bankruptcy.

4. **Bankruptcy ⬅⟹59—Permitting an attachment not an act of bankruptcy, where it has not proceeded to judgment.**

An insolvent corporation *held* not to have committed an act of bankruptcy, within Bankruptcy Act, § 3a (3), being Comp. St. § 9587 (a[3]), because of an attachment on its property which had not proceeded to judgment when the petition in bankruptcy was filed.

5. **Corporations ⬅⟹421—Directors of Massachusetts corporation may authorize general assignment.**

Under G. L. Mass. c. 156, § 25, conferring on the directors of a corporation all powers not given by law or the by-laws to the stockholders, the board of directors of a corporation, in the absence of a by-law otherwise providing, has power to authorize a general assignment for the benefit of creditors.

6. **Corporations ⬅⟹421—Assignment for creditors not included in word "sale" in Massachusetts statute providing for vote of stockholders to authorize sale, etc., and directors authorized to make such assignment by another section.**

In G. L. Mass. c. 156, § 42, providing that a corporation, by a two-thirds vote of its stockholders, may authorize the "sale, lease or exchange" of all its property and assets, the word "sale" does not include an assignment for the benefit of creditors, which is a conveyance in trust, and the making of such an assignment is within the powers conferred on the directors by section 25, unless otherwise provided in the by-laws.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Sale.]

7. **Corporations ⬅⟹400—General powers of directors held not limited by specific provisions of by-laws.**

Where the by-laws of a corporation provided that the directors should have "all the powers usually vested in the board of directors of a business corporation," a further specific provision authorizing them to purchase, lease, pledge, and sell personal property, does not limit their general powers with respect to real estate of the corporation.

8. **Bankruptcy ⬅⟹60—General assignment by corporation, though invalid for some purposes, is act of bankruptcy.**

A general assignment made by a corporation, though invalid for some purposes, is avoided by an adjudication in bankruptcy within four months, and will be regarded as an act of bankruptcy, within Bankruptcy Act § 3a (4), being Comp. St. § 9587 (a[4]).

9. **Corporations ⬅⟹421—Directors of insolvent corporation may take action to secure equitable division among creditors.**

When a corporation has reached the point of insolvency, and one creditor is about to secure a preference through legal proceedings, the directors have power to take action to secure an equitable distribution of its assets, and may make a general assignment, even if they have reason to expect that it will be avoided by bankruptcy proceedings.

10. **Bankruptcy ⬅⟹43—Directors of corporation may authorize voluntary petition.**

Since the amendment of Bankruptcy Act, § 4 (a), being Comp. St. § 9588 (a), permitting corporations to file voluntary petitions, the directors

⬅⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of a corporation may authorize the filing of such petition, and a creditor may not question their authority.

**11. Bankruptcy ☞60—General assignment by corporation, though ineffective as to some property, is act of bankruptcy.**

A general assignment by a corporation is no less an act of bankruptcy because it does not operate to convey the real estate of the corporation.

In Bankruptcy. In the matter of the E. T. Russell Company, Inc., alleged bankrupt. On report of referee, recommending adjudication. Report confirmed, and adjudication ordered.

Johnson, Clapp, Ives & Knight, of Boston, Mass., for petitioning creditors.

Barton & Harding, of Boston, Mass., for attaching creditor.

BREWSTER, District Judge. This involuntary petition in bankruptcy is being contested by a creditor holding an attachment on bankrupt's property, which will be dissolved by operation of the bankruptcy laws if adjudication is ordered upon the petition. The contest centers around the alleged acts of bankruptcy and the right of the petitioning creditors to avail themselves of certain of these acts.

The acts of bankruptcy alleged fall into three classes, as defined by the statute:

(1) That the bankrupt transferred, while insolvent, a portion of his property to certain of his creditors with intent to prefer such creditors over his other creditors.

(2) That the bankrupt suffered or permitted, while insolvent, a creditor to obtain a preference through legal proceedings and not having, at least five days before a sale or final disposition of the property affected by such preference, vacated or discharged such preference.

(3) That bankrupt made a general assignment for the benefit of its creditors.

The question of adjudication was referred to a special master, who has rendered his report, and the question of adjudication is now before the court upon the master's report, with a transcript of the testimony.

The alleged bankrupt is a Massachusetts corporation and was engaged in the business of packing and selling sardines. Its principal office is in Boston, Mass., and it has a plant in Maine, consisting of factory building, storehouse, wharves, four cottages or camps, and 12 acres of unimproved land. It also owns a fishing steamer, a motor vessel, a small two-masted schooner, four seines, and one seine boat. On July 6, 1921, the date of the filing of the petition in bankruptcy, it had on hand about 12,000 cases of sardines, packed in the season of 1919, of various grades and qualities, 90 per cent. of which were pledged to secure creditors. A fair valuation of these assets as of July 6, 1921, would not exceed $90,000, and an appraisal based upon replacement values would have shown these assets to be worth not over $123,-000. The total liabilities were not less than $135,000.

The bankrupt seems to have been a one-man corporation. Its president and general manager owned a controlling interest in the common

stock, nominated the board of directors, and had the entire control and management of the business and affairs of the corporation, and whatever was done in respect to the disbursement of moneys of the corporation was done under his direction. The plant had not been operated since 1919. It would have taken at least $50,000 to finance the necessary purchases and expenditures incident to a renewal of operations at the packing plant. All attempts to secure additional capital had failed. This was the state of affairs confronting the manager during the four months preceding the filing of the petition; yet, notwithstanding, the president and general manager on several occasions gave expression to his belief that the company was entirely solvent and that he would be able to pull it out of its difficulties and pay its creditors. The master finds that this belief was based on an unwarranted hope that the price of the product would advance sufficiently to enable the company to continue in business; that, judged by the standards of an ordinary and reasonable business man, the president should have known that in the then condition of the sardine market he could not raise sufficient money to commence operations; and that the assets, so far as the bankrupt was concerned, had only a liquidation value, and consequently that the company was insolvent.

While continuing the business, and within four months prior to the filing of the petition in bankruptcy, the bankrupt made certain payments of comparatively small amounts, and it is these payments which the petitioning creditors rely upon as transfers of property with intent to prefer. In respect to these payments I find the following facts:

(a) Robert A. Boit & Company of Boston:

On March 6, 1921, the bankrupt owed this creditor for premiums on outstanding insurance $1,241.74. The creditor was an insurance broker, and acted as such in procuring policies of insurance for the bankrupt. To avoid cancellation of the policies for nonpayment of premium, bankrupt agreed to pay creditors certain weekly installments. A few payments were made according to agreement; then a modified agreement was entered into for weekly payments of a smaller amount. Between March 6 and July 6 bankrupt paid the broker sums aggregating $609.20, and between the same dates the broker had procured renewals on expiring policies, the premiums upon which aggregated $1,800.

(b) H. H. Fisher:

This creditor was engaged in a teaming business, and had done teaming work for the bankrupt for a considerable period of time. The work consisted in moving cases of sardines sold to customers of the bankrupt. In accordance with the custom that had prevailed, bills were rendered the 1st of each month for teaming done during the previous month, and these bills were paid in the ordinary course, except for the work done during the month of June, for which the bankrupt owed $7.50. On March 6, 1921, the bankrupt owed $18.25 for February teaming.

(c) Boston Towel Supply Company:

This creditor furnished clean towel service to the bankrupt's office in Boston. It presented its bill to the bankrupt the early part of each

month for clean towel service during the preceding month. These monthly bills were paid on presentation, except the bill for service during June, amounting to $2.95, which the bankrupt owed this creditor on July 6, 1921. On March 6, 1921, it owed the creditor the same amount for February service.

(d) Thomas Groom & Co.:

This creditor conducts a stationery store in Boston. Bankrupt had a charge account with this creditor, and the latter rendered about the 1st of the month a bill covering goods sold during the preceding month. On March 6 the bankrupt owed this creditor $2.95 for purchases during February, which was paid March 8. On April 13 it paid $7.45 for merchandise purchased during the month of March, and on May 18 it paid this creditor 35 cents for merchandise purchased during April. On July 6, 1921, bankrupt owed this creditor nothing.

(e) Clarence B. Mitchell:

Mr. Mitchell was the president and general manager of the company. He often used the treasury of the bankrupt as a bank of deposit and draft; that is to say, he paid over to the bankrupt checks which came in for his personal account and gave the bankrupt's check in payment of his own personal obligations. During the four months preceding the filing of the petition there was paid out to Mitchell, or for his account, by the bankrupt, sums aggregating $1,101.32, and during the same period there was credited to Mr. Mitchell's account amounts aggregating $3,047.08, representing cash $47.08, and six months' salary accruing since December 31, 1920, $3,000.

(f) Finance & Guaranty Company of Baltimore:

This creditor held sardines pledged to secure loans of interest at the rate of 1½ per cent. per month. The practice under which the accounts between the parties were settled was as follows: The pledgee billed to the bankrupt each month the interest and charges during the preceding month, and the bankrupt made payments on the 10th of the month during which the statement was received. The interest and charges during the month of February amounted to $347.76, and were paid March 21, 1921. The interest and charges accruing during the month of March, 1921, were $312.03, and were paid April 18, 1921. The bills for interest and charges during May and June were not paid. The value of the collateral at then current market prices exceeded the amount of the indebtedness when these payments were made.

(g) George J. Jacques:

On May 18 the bankrupt had in his possession bills rendered by this creditor for job printing done for the bankrupt amounting to $20.25, and on that day these bills were paid.

[1] The payments referred to in subparagraphs (a), (b), (c), and (d) were made in the usual course of the business which the bankrupt was endeavoring to continue. They were incidental to the maintenance of a principal office and the sale of bankrupt's products. If it should be deemed that those payments effected a preference, which is a matter of some doubt (In re Douglas Coal & Coke Co. [D. C.] 131 Fed. 769; In re Perlhefter [D. C.] 177 Fed. 299), the circumstances are

such that no presumption would arise that in making them the bankrupt intended a preference (In re Freeman Cotting Coat Co. [D. C.] 212 Fed. 548; In re Gilbert [D. C.] 112 Fed. 951; In re Stovall Grocery Store (D. C.) 161 Fed. 882.

[2] The payment referred to in subparagraph (f) to the Finance & Guaranty Company cannot be deemed preferential, because of the finding that the security held by the creditor exceeded the amount of the indebtedness secured.

The payments referred to in subparagraph (e) to the president cannot, in view of the rule laid down in this district in Re Henry C. King Co. (D. C.) 113 Fed. 110, be regarded as a preference.

[3] This leaves only the payment of Jacques of $20.25, subparagraph (g). This payment was clearly preferential, but in view of the facts surrounding the payment, the small amount involved and the expectation of the president, although unwarranted, that bankruptcy might be avoided, I am unable to find that this payment alone constituted an act of bankruptcy. In re Columbia Real Estate Co. (D. C.) 205 Fed. 980; In re Gilbert, supra; In re Perlhefter, supra. None of these payments by the bankrupt, standing alone, would warrant the court in finding that it constituted an act of bankruptcy; but the master has found that after April 1, 1921, the responsible officers of the bankrupt knew, or judged by the standards of reasonable men should have known, that the financial condition of the bankrupt was such that, if they continued the business and incurred further debts and obligations and further expenses, such action must necessarily result in increasing the then existing excess of liabilities over and above the assets, and that the making of any payments to any creditors other than those creditors holding security up to the full amount of their claims must result in giving to such creditors a larger proportion of their claims than could possibly be received by other creditors of the same class; that "the action of the bankrupt in continuing the business and in paying current expenses resulted in the depletion of the bankrupt estate."

Can it be said, in view of these findings, that the bankrupt committed an act of bankruptcy by continuing its endeavors to market its product and to remove the financial difficulties confronting it, and to that end making payments in the ordinary course of such business as it was able to carry on? I think not. It has been frequently held, in this and other jurisdictions, that one does not commit an act of bankruptcy by electing to continue a business, instead of filing a petition in bankruptcy or otherwise liquidating, although all indications point to such bankruptcy or liquidation as an inevitable result, and the continued operations resulted in a depletion of the bankrupt's estate. Wilson v. City Bank, 17 Wall. 473, 21 L. Ed. 723; Grant v. National Bank, 97 U. S. 81, 24 L. Ed. 971; Hardy v. Gray, 144 Fed. 922; In re Freeman Cotting Coat Co., supra. In this latter case Judge Morton remarks that:

"An insolvent has the right to endeavor to continue; he is not obliged to shut up shop the moment his assets become less than his liabilities. Tiffany v. Lucas, 15 Wall. 410."

I have reached the conclusion, therefore, that the petitioners have failed to maintain their burden of showing that the bankrupt, while insolvent, transferred a portion of its property to one or more of its creditors with intent to prefer such creditors over its other creditors.

[4] As to the second alleged act of bankruptcy, viz. that the bankrupt had suffered or permitted, while insolvent, a creditor to obtain a preference in legal proceedings and not having, at least five days before a sale or final disposition of the property affected by such preference, vacated or discharged such preference, it appears that the creditor resisting adjudication holds an attachment on the property of the bankrupt, made upon a writ issuing out of the state court of the state of Maine, but the proceedings in that court had not progressed to the point of sale or final disposition. In fact, no judgment had been obtained by the plaintiff in this action. It is clear on the authorities that the proceedings in the state court had not reached the point where the failure of the bankrupt to act could be regarded as an act of bankruptcy. Citizens' Banking Co. v. Ravenna National Bank, 234 U. S. 360, 34 Sup. Ct. 806, 58 L. Ed. 1352; Matter of McGraw (D. C.) 254 Fed. 442; Parmenter Manufacturing Co. v. Stoever, 97 Fed. 330, 38 C. C. A. 200.

[5, 6] The third act of bankruptcy alleged in the petition is a common-law assignment for the benefit of creditors, made by the bankrupt on July 5, 1921. This assignment was authorized by the board of directors by votes passed June 27, 1921, and July 2, 1921. No action was taken by the stockholders to authorize or ratify the assignment. From the evidence the inference is warranted that the assignment was made for the purpose of creating an act of bankruptcy, which would be utilized by the petitioners as a basis of involuntary proceedings in bankruptcy; the petition being filed July 6, 1921, or one day before the maturity of the attachment held on the bankrupt's property by the objecting creditor. The power of the directors to authorize the assignment is denied by the opposing creditor. The laws of Massachusetts (G. L. c. 156, § 25) confer upon the board of directors all the powers of the corporation, except such as are conferred by law or the by-laws of the corporation upon the stockholders. The only applicable provisions conferring powers of the corporation upon the stockholders are those contained in sections 41 and 42 of said chapter 156, authorizing amendments after organization by vote of stockholders. Section 42 provides that every corporation may, at a meeting duly called for the purpose by vote of two-thirds of each class of stock outstanding and entitled to vote, authorize the sale, lease, or exchange of all its property and assets, including its good will, upon such terms and conditions as it deems expedient. It was held in this circuit, in the case of Commerce Trust Co. v. Chandler et al. (C. C.) 284 Fed. 737, that these provisions impart "a distinct legislative purpose to increase, not decrease, the rights of stockholders with regard to the sale, lease, and exchange of all the property and assets of their corporations." Thus in the same case it was held that corresponding provisions of an earlier statute (Acts 1903, c. 437, § 40) extended to a mortgage of all the assets of the corporation given to secure a demand note; the Court of Appeals

giving it as their opinion that the mortgage was in terms and legal effect a sale subject to defeasance.

The question whether a common-law assignment for the benefit of creditors is in terms and legal effect a sale seems still to be open. An assignment differs from a mortgage in certain particulars which, for the purpose of this inquiry, are significant. The property is conveyed to a trustee who holds in trust for the corporation until creditors have become parties, and then for the benefit of such creditors as do become parties, and thereafter for the benefit of the corporation again. Its whole purpose is to apply the assets of the corporation to the payment of its debts. This, I conceive, is something the directors have power to do. The stockholder is only interested in what remains after debts are paid. This stockholder's interest will be conserved, theoretically at least, by the trustee. Commerce Trust Co. v. Chandler, supra, therefore, is not necessarily controlling authority on the proposition now under consideration. I am unable to extend the meaning of the word "sale," so that it will include an assignment for the benefit of creditors. It follows, therefore, that the powers of the corporation to execute assignments for the benefit of creditors are not conferred by law upon the stockholders.

[7] Nor are they conferred by the by-laws of this corporation. The by-laws contain the following provisions respecting the powers of directors:

"The directors shall have all the powers usually vested in a board of directors of a business corporation. They shall have the general direction, control and management of the property and business of the corporation, except so far as limited by the vote of the stockholders or by-laws. They shall have ample power to purchase, lease, pledge and sell all such personal property and to make all such contracts and agreements in behalf of the corporation as may be needful or convenient for the successful prosecution of its business and operations. They shall employ, and at their pleasure, remove all such persons and agents as they may deem necessary or proper for conducting the business of the corporation, and shall determine the compensation and the duties (in addition to those fixed by the by-laws) of all the officers, agents, clerks and servants of the corporation, and generally, to do all such lawful acts, and take all such lawful measures consistent with the by-laws of the corporation as they shall deem best calculated to promote to the fullest extent the interests of the stockholders."

There was no stockholders' vote limiting the powers of the board of directors. It was argued that the provisions of the by-laws expressly authorizing directors "to purchase, lease, pledge and sell personal property only" operated to deprive the directors of the power to make a general assignment of all its assets. This by-law gives the directors all the powers usually vested in the board of directors of a business corporation and obviously the remaining portions of the by-law do not limit or impair the powers conferred by the laws of Massachusetts upon directors or, in other words, do not confer powers upon stockholders, at least until the stockholders have, by some vote, limited the powers conferred upon directors by section 25, above referred to.

The question is a close one, but I have, after careful consideration of the authorities and the history of the legislation, reached the conclusion that under the laws of Massachusetts in force at the time of

this assignment the directors had power to authorize its execution. I am fortified in this opinion by the reasoning and conclusions of Judge Dodge in the case of Cate v. Connell, 173 Fed. 445 (Note), 97 C. C. A. 647.

This conclusion seems to be in harmony with that reached in the federal courts of New York. In re Guanacevi Tunnel Co., 201 Fed. 316, 119 C. C. A. 554.

[8] If this conclusion should not stand the test when attacked by a stockholder seeking to enforce his rights as such stockholder, it would not necessarily follow in consequence that the action of the bankrupt corporation, taken upon the authority of the directors' vote, would not constitute an act of bankruptcy. A common-law assignment, though fully authorized, is a constructive fraud upon the Bankruptcy Act, and if made within four months from the filing of the petition in bankruptcy will be void as against the trustee in bankruptcy. The avoidance relates back to the date of the assignment, so that no title passes by virtue of the assignment. Randolph v. Scruggs, 190 U. S. 533, 23 Sup. Ct. 710, 47 L. Ed. 1165; In re Chase, 124 Fed. 753, 59 C. C. A. 629.

An assignment, therefore, though fully authorized by the stockholders and directors, would not stand against a trustee in bankruptcy, if made within four months prior to the petition in bankruptcy. The precise question is not so much whether the assignment itself is valid for all purposes as whether the corporation has thereby committed an act of bankruptcy. The making of an assignment, though invalid for some purposes, will be regarded as an act of bankruptcy In re Meyer, 98 Fed. 976, 39 C. C. A. 368; Griffin v. Dutton, 165 Fed. 626, 91 C. C. A. 614. In re Federal Lumber Co. (D. C.) 185 Fed. 926; Cate v. Connell, supra.

[9] If a board of directors, charged with the duty of conducting the affairs of the corporation, and clothed with powers of the corporation, found the corporation in a situation where it could not pay its indebtedness where one creditor was about to obtain by legal proceeding security for its claim to the detriment of other creditors, and in order to more equitably distribute its assets it voted to authorize an assignment, the action was that of the corporation, and the corporation has committed an act of bankruptcy. When a corporation has reached the point of insolvency, as this corporation had, it is within the powers of the directors to provide for a distribution of its assets among its creditors, and if they elect to resort to a common-law assignment they are but taking such measures as appear to them proper to liquidate, and this, even though they may have reason to exepect that their acts would become void by subsequent bankruptcy proceedings.

In re Kenwood Ice Co. (D. C.) 189 Fed. 525, the court states:

"A board of directors ought to have the power to put the company into bankruptcy. They have care of the general business of the corporation. They are the persons who know whether the corporation is able to go on or not. It might very well happen that under the articles and by-laws of the corporation it would be impossible to hold a meeting of the stockholders for months. Under these circumstances the bankruptcy of the corporation might be delayed so long that in many cases the purposes of the bankrupt law

would be defeated and preferences given. I am satisfied that the board of directors at a duly called meeting has the power to put the corporation into bankruptcy."

But it is said that the action of the corporation in authorizing a common-law assignment was but a subterfuge to avoid the necessity of a stockholders' vote, which, ever since the decision of Judge Lowell in Re Bates Machine Co. (D. C.) 91 Fed. 625, has been deemed necessary where the fifth act of bankruptcy is alleged, relating to an admission in writing of inability to pay debts and willingness to be adjudicated a bankrupt on that ground.

The value of In re Bates Machine Co. as an authority is impaired, not only by the fact that it is opposed by the great weight of authority in other jurisdictions, but by the subsequent changes in the business corporation laws in Massachusetts, and it may well be doubted whether Judge Lowell's views respecting the authority of directors to authorize an assignment would be followed at the present time under the existing statutes, both state and federal. In 1889, when the case of In re Bates Machine Co. was decided, the statutes of Massachusetts prohibited a conveyance of real estate without vote of the stockholders. Statutes in force in 1921 contain no such provisions. Although Judge Lowell conceded that it was well settled by authority that under ordinary statutes or charters the authority to make a general assignment did inhere in a board of directors, nevertheless, in view of the laws governing conveyances of real estate, he was of the opinion that assignments involving conveyances of real estate required a stockholders' vote.

[10] It is to be further borne in mind that the decision in Re Bates Machine Co. was handed down before the amendment of 1910 permitting corporations to file voluntary petitions in bankruptcy. Since that amendment the great weight of authority supports the proposition that a voluntary petition in bankruptcy may be authorized by the directors. Bell v. Blessing, 225 Fed. 750, 141 C. C. A. 34; In re Jefferson Casket Co. (D. C.) 182 Fed. 689; In re Guanacevi Tunnel Co. supra; In re United Grocery Co. (D. C.) 239 Fed. 1016; In re S. & S. Manufacturing & Sales Co. (D. C.) 246 Fed. 1005; In re Kenwood Ice Co. supra.

Moreover, the by-laws provide that only holders of common stock shall be entitled to vote. The president, who executed on behalf of the corporation the instrument of assignment, owned more than two-thirds of the common shares, and he owned the majority of the total outstanding shares of both classes.

In view of the language of Judge Dodge in Cate v. Connell, supra, these facts further support the conclusions which I have reached.

It may be well to note in this connection that numerous cases may be cited upon the proposition that creditors may not object to the want of authority in the directors who have voted to authorize a voluntary petition in bankruptcy. In re Guanacevi Tunnel Co. supra. In re Ives, 113 Fed. 911, 51 C. C. A. 541; Johnson v. Norris, 190 Fed. 459, 111 C. C. A. 291, L. R. A. 1915B, 884. In re United Grocery Co. supra.

[11] It is further urged that according to the laws of the state of Maine no corporation can sell, lease, consolidate, or in any manner part with its franchise, or its entire property, or any of its property, corporate rights, or privileges essential to the conduct of its corporate business, and purposes otherwise than in the ordinary and usual course of its business, except with the consent of its stockholders. But, if it be held that the Maine statute applies to assignments for the benefit of creditors, the Legislature of the state of Maine cannot enact any laws that will take from directors of Massachusetts corporations powers conferred by Massachusetts laws. It may be that title to the Maine real estate would not pass to the assignee; but, as we have seen, no title passes by virtue of the assignment as against the bankruptcy laws. The act of the corporation is no less an act of bankruptcy because it does not operate to convey all it purported to convey.

It appeared in evidence that one of the petitioning creditors, the Commercial National Bank, had, shortly after the attachment of the opposing creditor had been placed upon the property of the bankrupt, exacted a promise from the bankrupt that the attachment should not be allowed to ripen by the lapse of time. This petitioner, upon several occasions during the four months following the attachment, was in conference with the president of the bankrupt, and on more than one occasion called attention to the fact that the attachment would ripen unless action was taken, and, as the time for maturity approached, this creditor became more insistent, and finally through counsel urged upon the bankrupt the necessity of a common-law assignment after it had become too late to hold a stockholders' meeting according to the by-laws. It is suggested that this creditor is estopped from alleging the assignment as an act of bankruptcy. I am of the opinion that the facts hardly justify the court in applying to this case the doctrine of estoppel or ruling that the action of the petitioner in counseling a common-law assignment precluded it from seeking an adjudication upon the assignment as an act of bankruptcy. It is unnecessary, however, to consider this phase of the question further, because three creditors intervened who had no part in inducing action by the corporation and had at the time of the filing of the intervening petition no knowledge of what transpired before the assignment, so that the petition shows sufficient in number and amount of claims if the claim of the Commercial National Bank be disregarded.

The petitioners, therefore, are entitled to an adjudication, but only on the ground that the bankrupt made a general assignment for the benefit of its creditors. Decrees may be entered, confirming the master's report, and ordering adjudication of the bankrupt.