# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STREAM TV NETWORKS, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2020-0766-JTL |
| | ) | |
| SEECUBIC, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| SEECUBIC, INC., | ) | |
| | ) | |
| Counterclaimant and | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STREAM TV NETWORKS, INC., | ) | |
| | ) | |
| Counterclaim Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MATHU RAJAN, and RAJA RAJAN, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: December 2, 2021
Date Decided: December 8, 2021

Steven P. Wood, Andrew S. Dupre, Brian R. Lemon, Sarah E. Delia, McCARTER & ENGLISH, LLP, Wilmington, Delaware; *Attorneys for Plaintiff and Counterclaim Defendant Stream TV Networks, Inc. and for Third-Party Defendants Mathu Rajan and Raja Rajan.*

Robert S. Saunders, Jenness E. Parker, Bonnie W. David, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; Eben P. Colby, Marley Ann Brumme, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Boston, Massachusetts; *Attorneys for Defendant and Counterclaim Plaintiff SeeCubic, Inc.*

**LASTER, V.C.**

Stream TV Networks, Inc. filed this action against SeeCubic, Inc. in September 2020. Each side moved for a preliminary injunction. Both motions turned on the validity of an agreement dated May 6, 2020, between Stream, its two secured creditors, and fifty-two of its stockholders. The parties referred to the agreement as the "Omnibus Agreement."

By the time the Omnibus Agreement was executed, Stream had defaulted on more than $50 million in debt to its secured creditors, owed another $16 million to trade creditors, and could not pay its bills as they came due. Stream had missed payroll in January 2020, furloughed a number of workers, and avoided missing payroll in February 2020 only because of an emergency loan from one of its secured creditors and another investor. By any measure, Stream was insolvent and failing.

In the Omnibus Agreement, Stream agreed to transfer all of its assets to SeeCubic, a newly formed entity controlled by its secured creditors. Stream also granted its secured creditors a power of attorney to effectuate the transfers. Stream's secured creditors already held security interests in all of Stream's assets and had the right to foreclose on those assets. In the Omnibus Agreement, Stream's secured creditors agreed to release their claims against Stream upon completion of the transfer of Stream's assets to SeeCubic.

The Omnibus Agreement avoided an execution sale in which Stream and its stockholders would have been left with nothing. Instead, the Omnibus Agreement provided Stream's minority investors with the right to swap their shares in Stream for shares in SeeCubic. The Omnibus Agreement also provided for the issuance of one million shares in SeeCubic to Stream.

In this lawsuit, Stream sought a declaration that the Omnibus Agreement was invalid. Stream's motion for a preliminary injunction requested an interim order that would prevent SeeCubic from enforcing the Omnibus Agreement. In response, SeeCubic maintained that the Omnibus Agreement was valid. SeeCubic's motion for a preliminary injunction requested an interim order that would prevent Stream from interfering with the rights that SeeCubic had obtained under the Omnibus Agreement.

In December 2020, the court held that it was reasonably probable that the Omnibus Agreement was a valid and binding agreement, enforceable in accordance with its terms. *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016 (Del. Ch. 2020) (the "Injunction Decision"). The court accordingly denied Stream's application, granted SeeCubic's application, and entered a preliminary injunction barring Stream and anyone acting in concert with it from taking any action to interfere with SeeCubic's exercise of its rights under the Omnibus Agreement. The Injunction Decision provides additional background for this dispute, and this memorandum opinion uses the terms defined in the Injunction Decision.

SeeCubic next moved for summary judgment. Dkt. 117. Stream and its principals, the brothers Mathu and Raja Rajan, engaged in a series of efforts to escape from the Injunction Decision and interfere with SeeCubic's rights. The Rajans first caused Stream to file for bankruptcy. *See* Dkt. 126. The bankruptcy court dismissed the case as a bad faith filing, describing it as an effort "to gain a tactical litigation advantage that is a part of a continued pattern of effort to nullify, undermine, and/or interfere with the [O]mnibus [A]greement, vitiate the purpose and effect of the Chancery Court's order, and to maintain

2

ownership and control over the assets of the debtor . . . ." Dkt. 127 Ex. B. at 13–14; *see id.* at 14–16 (documenting the Rajans' additional efforts to interfere with the injunction, which include Mathu Rajan establishing a new company which "began to fundraise using Stream's assets despite the injunction"). After the bankruptcy stay lifted and litigation in this court resumed, Mathu Rajan filed a pro se letter application claiming that the Injunction Decision was the product of fraud. Dkt. 138. He then filed a formal motion to set aside the Injunction Decision. Dkt. 143. The Rajans subsequently filed another motion to modify the preliminary injunction. Dkt. 185. Then they had a third party seek to intervene and file additional motions. *See* Dkt. 183. Along the way, Stream and the Rajans ran through three different teams of lawyers from six different law firms, in addition to the times when Raja Rajan sought to act as Stream's attorney and Mathu Rajan sought to litigate pro se. Creating litigation chaos seemed to be one of the Rajans' strategies.

The court rejected the various efforts to set aside the Injunction Decision. *See* Dkts. 186, 191, 192. In September 2021, the court granted in part SeeCubic's motion for summary judgment. Dkt. 193 (the "Summary Judgment Decision"). In the portion of the motion that the court granted, the court determined that the Omnibus Agreement was valid, and it converted the preliminary injunction into a permanent injunction.

Now represented by their current counsel, Stream and the Rajans moved to have the court enter the Summary Judgment Decision as a partial final judgment. Dkt. 195. The court granted that request. Dkt. 204. Stream and the Rajans then noticed an appeal. Dkt. 206.

3

On November 12, 2021, Stream and the Rajans moved "to modify the Court's September 23, 2021 permanent injunction to preserve the relevant [a]ssets pending appeal, or alternatively to grant an injunction to preserve those [a]ssets pending appeal." Dkt. 212 (the "Motion"). For simplicity, this decision refers only to Stream when discussing the positions that Stream and the Rajans have advanced.

## I.      THE REQUEST TO MODIFY THE PERMANENT INJUNCTION

Initially, Stream seeks to modify the injunction under Court of Chancery Rule 62(c). Motion ¶ 3. Stream's proposed order would have the court add the following language to the permanent injunction: "SeeCubic, Inc. and those acting in concert with it shall not destroy, alienate, or transfer the [a]ssets pending further order of this Court, or of the Supreme Court of Delaware." Dkt. 212 Proposed Order.

Court of Chancery Rule 62(c) provides that "the Court in its discretion may suspend, modify, restore, or grant an injunction during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party." Ct. Ch. R. 62(c). When considering a Rule 62(c) motion, the court "typically consider[s] the same factors pertinent to the issuance of a preliminary injunction." Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 18.09 (2021); *see W.B. Venables & Sons, Inc. v. Bd. of Educ. of Lake Forest Sch. Dist.*, 1978 WL 22450, at *1 (Del. Ch. Feb. 1, 1978) (denying a motion brought under Rule 62(c) "for the same reasons that [the movant's] previous motions were denied"). When the court has put an injunction in place, the central question is whether circumstances have changed that would constitute good cause for altering the injunction.

4

*Cf. Berkowitz v. MacPherson*, 1995 WL 1799136, at *1 (Del. Ch. July 24, 1995) (noting the "power of a court of equity to modify an injunction in the light of changed circumstances").

The permanent injunction that the court entered has stood in substance for precisely a year, ever since the court entered comparable relief as a preliminary injunction on December 8, 2020. Dkt. 111. There have not been any significant changes in the status quo since then.

During the intervening year, the court has addressed two applications that sought to set aside or modify the preliminary injunction. Neither provided good cause for relief, and the court denied both. Dkts. 191, 192. Three months ago, in September 2021, the court converted the preliminary injunction into a permanent injunction by issuing the Summary Judgment Decision. In opposing SeeCubic's motion for summary judgment, Stream did not argue that the factual landscape had changed in a meaningful way. Stream rather relied on its prior arguments in opposition to SeeCubic's application for a preliminary injunction and asserted that the Injunction Decision was wrongly decided. *See* Dkt. 119 at 6.

Stream now claims that two events warrant modifying the year-old injunction. First, Stream argues that "SeeCubic has taken actions to destroy and/or transfer [a]ssets subject to the Omnibus Agreement." Motion ¶ 4. As support, Stream notes that on September 3, 2021, SeeCubic "ordered a contract partner in Hong Kong to destroy 500 specialty lenses used to calibrate certain [a]sset machinery." *Id.* In actuality, SeeCubic authorized the owner of a warehouse to destroy the lenses that Stream had stored there because Stream failed to pay the storage fees for the period predating the Injunction Decision. Dkt. 216 (the

5

"Opposition") ¶ 9. In addition, the lenses were "from a largely flawed, older batch and have been superseded by new lenses SeeCubic has since designed for its projects." *Id.* ¶ 10. As a result, "the prospective expenses associated with storing and shipping the [l]enses . . . exceeded their value." *Id.* SeeCubic made a reasonable business decision to authorize the destruction of the lenses. It is not rational to infer, as Stream asserts, that "SeeCubic would rather the [a]ssets are destroyed than sold to a third-party to mitigate damages, or returned to Stream TV." Motion ¶ 4. This event does not provide good cause to modify the injunction.

Second, Stream claims that the assets are in jeopardy based on unverified allegations in a complaint that a former SeeCubic contractor filed in California regarding a dispute over an employment contract.[1] *See id.* ¶¶ 5–7. The litigation is unrelated to this case, but the unverified complaint makes passing reference to the plaintiff possessing unspecified "tech and IT assets." *Id.* Ex. B ¶ 22. Stream draws the unreasonable inference that assets "are at risk because SeeCubic breached its unlawful agreement with" the plaintiff. Motion ¶ 6. Stream's fears are unsubstantiated and do not give rise to a realistic threat that assets are in jeopardy.

---

[1] As Stream points out, a complaint filed in California does not need to be verified unless "verification of [the] complaint is specifically required by statute." *Verification*, Cal. Civ. Prac. Proc. § 7.10, Westlaw (database updated Oct. 2021); Dkt. 219 ¶ 4. That procedural point does not change the fact that the complaint's allegations are unverified. A complaint's allegations are just that—allegations. Here, the allegations also lack the incremental imprimatur of verification.

To the extent the Motion seeks to modify the existing injunction, the Motion is denied.

## II. THE REQUEST FOR A STAY PENDING APPEAL

The bulk of the Motion seeks a stay pending appeal. Stream envisions a stay that would have the same effect as the modification to the injunction that this decision has rejected.

"Stays pending appeal . . . shall be governed by [A]rticle IV, § 24 of the Constitution of the State of Delaware and by the Rules of the Supreme Court." Ct. Ch. R. 62(d). The applicable Supreme Court rule is Rule 32(a), which provides that "[a] stay or an injunction pending appeal may be granted or denied in the discretion of the trial court." Supr. Ct. R. 32(a).

The Supreme Court has identified four factors to guide the trial court in exercising its discretion: (1) "a preliminary assessment of likelihood of success on the merits of the appeal," (2) "whether the [party seeking a stay] will suffer irreparable injury if the stay is not granted," (3) "whether any other interested party will suffer substantial harm if the stay is granted;" and (4) "whether the public interest will be harmed if the stay is granted." *Kirpat, Inc. v. Del. Alcoholic Beverage Control Comm'n*, 741 A.2d 356, 357–58 (Del. 1998). The factors are not to be considered in isolation, but as part of a balancing of "all of the equities involved in the case together." *Id.* at 358.

In *Kirpat*, the Supreme Court reversed the denial of a stay pending appeal because the trial court focused too narrowly on the first factor, "a preliminary assessment of likelihood of success on the merits of the appeal." *Id.* at 357. As *Kirpat* explained, this

7

element "cannot be interpreted literally or in a vacuum when analyzing a motion for stay pending appeal." *Id.* at 358. When considering a stay pending appeal, the trial court has already issued a decision, so a literal reading "would lead most probably to consistent denials of stay motions . . . because the trial court would be required first to confess error in its ruling before it could issue a stay." *Id.* (internal quotation marks omitted). Instead, "[i]f the other three factors strongly favor interim relief, then a court may exercise its discretion to reach an equitable resolution by granting a stay if the petitioner has presented a serious legal question that raises a fair ground for litigation and thus for more deliberative investigation." *Id.* (internal quotation marks omitted).

"Where the civil judgment is one requiring the payment of money, the giving of a bond in due form and in an appropriate amount is all that should ordinarily be required to justify a stay of the effectiveness of the order appealed from." *In re State Ins. Dep't v. Remco Ins. Co.*, 1986 WL 3419, at *2 (Del. Ch. Mar. 18, 1986). But where, as here, "injunctive relief is awarded . . . the matter will be more complex because interests other than those adequately compensable with money may be involved." *Id.* Under such circumstances, "the exercise of discretion called for must be sensitive to the particularities of the various interests impacted by the judgment." *Id.*

Informed by *Kirpat*, this decision analyzes the second, third, and fourth factors, then returns to the first. Notably, under *Kirpat*, a stay only should be granted if the second, third, and fourth factors "strongly favor interim relief." *Id.*

## A.    The Second *Kirpat* Factor

The second *Kirpat* factor examines whether the party seeking a stay "will suffer irreparable injury if the stay is not granted." *Kirpat*, 741 A.2d at 357.  This factor favors a stay, but only mildly.

As the Injunction Decision recognized, the parties advanced mirror-image claims, resulting in there being "no dispute about the existence of irreparable harm." 250 A.3d at 1028. It remains the case that whether the Omnibus Agreement is valid determines, in the near term, who controls Stream's assets. That control dispute necessarily gives rise to a degree of irreparable harm. That harm only will become manifest, however, if it both becomes necessary to restore Stream's assets and it proves impossible to do so. SeeCubic has undertaken to maintain the assets, so it seems likely that the court will be able to restore the assets if that becomes necessary. In addition, since the issuance of the Injunction Decision, SeeCubic has lodged a $1 million bond with the court. Those funds protect SeeCubic from pecuniary loss and mitigate the financial harm that Stream would suffer from an improvidently entered injunction.

Stream also notes that "deprivation of a preferred shareholder's right to vote constitutes irreparable harm in Delaware law."  Motion ¶ 23. That proposition is true. *See Pell v. Kill*, 135 A.3d 764, 793 (Del. Ch. 2016). At the same time, the voting rights issue in this case leads to harm because it affects control over Stream's assets. The invocation of voting rights does not add materially to the analysis.

9

Taking these considerations into account, the second *Kirpat* factor weighs in favor of granting a stay, but only mildly so. The threats that Stream has identified rest on legal propositions and hypotheticals. They are not grounded in fact.

## B.    The Third *Kirpat* Factor

The third *Kirpat* factor considers "whether any other interested party will suffer substantial harm if the stay is granted." 741 A.2d at 357. This factor weighs against a stay.

Under the Summary Judgment Decision, SeeCubic is entitled to take title to the assets that it acquired under the Omnibus Agreement. Having done so, SeeCubic may use those assets to operate the business that Stream formerly operated. Taking these steps requires that SeeCubic interact with third parties. Granting the relief that Stream has requested would enable Stream to interfere with SeeCubic's ability to exercise its rights under the Omnibus Agreement.

Stream states that it does "not seek to interfere with SeeCubic's ability to use the [a]ssets in the ordinary course of business or to meet any customer obligation." Motion ¶ 24. Stream's actions during the course of this litigation undermine that assertion. As discussed above, Stream and the Rajan brothers have tried consistently to interfere with SeeCubic's ability to exercise its rights under the Omnibus Agreement and use the assets that SeeCubic acquired.

It is also undisputed that under the pre-litigation "status quo," Stream was "insolvent and failing." Injunction Decision, 250 A.3d at 1020. By contrast, with the injunction in place, SeeCubic is "thriving," has "deployed in excess of $10 million in order to further

10

develop the glasses-free 3-D technology," has "reduced its debt by over 50%, and . . . is not in default on any debt." Opposition ¶ 11 (quoting *id.* Declaration ¶ 3).

Issuing a stay pending appeal would unsettle a currently stable situation. Both SeeCubic and third parties, such as its customers, could suffer harm. *See Lynch v. Gonzalez,* 2020 WL 5648567, at *8 (Del. Ch. Sept. 22, 2020) (considering the substantial harm to the non-moving party if interim relief was granted).

As with the second *Kirpat* factor, these concerns are presently hypothetical. Unlike the second factor, however, Stream's track record provides a foundation for concern. The third *Kirpat* factor therefore weighs against granting a stay, and to a degree comparatively greater than the second factor weighed in favor of granting a stay.

## C.    The Fourth *Kirpat* Factor

The fourth *Kirpat* factor is "whether the public interest will be harmed if the stay is granted." *Id.* at 357. The litigation over the Omnibus Agreement is a dispute between private parties. It does not invoke significant public policy interests. This factor therefore does not affect the analysis.

Stream attempts to invoke public policy interests by making a Chicken-Little argument that Delaware will lose its franchise if the injunction stands. In the Injunction Decision, the court noted that "public policy considerations" supported the conclusion that "Section 271 does not apply to a transaction like the one contemplated by the Omnibus Agreement, in which an insolvent and failing firm transfers its assets to its secured creditors in lieu of a formal foreclosure proceeding." 250 A.3d at 1041–42. But contrary to Stream's

11

assertions, the Injunction Decision did not "define[] its conclusions of law as policy driven." Motion ¶ 22.

The Injunction Decision concluded that Section 271 does not apply to a transaction like the one contemplated by the Omnibus Agreement, and *then* considered whether public policy supported that conclusion. The Injunction Decision explained that "interpreting Section 271 as applying to a creditor's efforts to levy on its security would undercut the value of the security interest." 250 A.3d at 1042. Citing a transcript ruling by then-Vice Chancellor Strine, the Injunction Decision further explained that "[i]f stockholders were asked to approve the transfer of an insolvent or failing corporation's assets to a secured creditor, they might well vote to reject the transfer, if only to create a bargaining leverage against the creditor." *Id.* at 1042. In light of this potential stockholder holdup scenario, "[c]orporations and stockholders would suffer the second-order effects as creditors adjusted to the new reality, insisted on additional protections, and raised the cost of capital." *Id.* at 1043. The court refused to endorse "such a mischievous and harmful result." *Id.*

Stream argues that the Injunction Decision's "policy analysis is wrong, in a manner effecting disaster for the comparative corporate law advantage of our State." Motion ¶ 22. That apocalyptic threat arises, according to Stream, because "[f]ounders of the world's most innovative, important, future-franchise-tax-paying corporations" will not incorporate in a state that "strip[s]" them of their preferred share voting rights in the event of insolvency. *Id.*

The Injunction Decision did not strip stockholders of their rights, and Stream's febrile fear is not realistic. The Injunction Decision interpreted the scope of Section 271 and held that it did not apply to a transfer of assets by an insolvent firm that extinguished the claims of its secured creditors. The Injunction Decision then held that a voting right which closely resembled Section 271 did not give rise to a class vote under the same circumstances, just as Chancellor Allen previously held that a right to vote on a charter amendment where the language resembled Section 242 did not give rise to a class vote on a merger where the statute did not provide one. *See Warner Commc'ns Inc. v. Chris-Craft Indus., Inc.*, 583 A.2d 962, 969 (Del. Ch. 1989). Drafters of preferred stock rights remain free to make their charter provisions explicit, as they did in response to the *Warner* decision. *See, e.g.*, *Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 847 (Del. 1998).

It is, of course, true that "[t]he public interest is served by the Supreme Court acting as the final arbiter of important issues of first impression in Delaware corporate law." Motion ¶ 25. That will happen in this case regardless of whether a stay issues. The fourth *Kirpat* factor therefore does not support granting a stay.

## D. The First *Kirpat* Factor

Taken together, the second, third, and fourth *Kirpat* factors do not support granting a stay. They certainly do not "strongly favor interim relief." *See Kirpat*, 741 A.2d at 358. The analysis accordingly could stop there. Nevertheless, because *Kirpat* requires "balanc[ing] all of the equities involved in the case together," the court returns to the first *Kirpat* factor. *Id.* That factor tasks the court with making a "preliminary assessment of

13

likelihood of success on the merits of the appeal." *Id.* at 357. For the reasons explained below, the first *Kirpat* factor does not weigh in favor of granting a stay pending appeal.

The Motion presents three main arguments on the merits. They are (1) "[a]s a question of first impression, 8 *Del. C.* § 271 superseded the common law insolvency exception;" (2) "*[a]rguendo* if the common law exception still exists, it was an exception to a unanimous shareholder vote requirement, and not to the shareholders voting at all" (emphasis removed); and (3) "[t]he Charter guaranteed the Preferred Shares the right to vote upon the Omnibus Agreement, and does not incorporate the insolvency exception (which does not exist)." Motion ¶ 12.

The second ground for appeal is the most significant. A proper understanding of the common law rule and its exceptions demonstrates that a board of directors had the authority to transfer the assets of an insolvent and failing firm without a stockholder vote, including through the settled mechanism of an assignment for the benefit of creditors. With that understanding, it becomes evident that while Section 271 superseded (i.e., altered) one aspect of the common law rule (the unanimous voting requirement), it did not supersede the pertinent exception to the common law rule. And it becomes clear that the voting right in the Rajans' preferred stock does not call for a different interpretation, because its language closely tracks Section 271. The first *Kirpat* factor therefore does not weigh in favor of granting a stay.

14

### 1. The Common Law Exception For A Failing Business

At common law, before the directors could sell all of the assets of a prosperous corporation, they had to obtain unanimous stockholder approval.[2] In this regard, the original rule for a sale of all assets paralleled the original rule for a merger, which also required unanimous stockholder approval.[3]

Unanimity requirements give rise to holdup problems.[4] Situations thus arose in which directors sought to sell all of a corporation's assets without obtaining unanimous stockholder approval. The cases fell into two broad categories. First, there were situations where the sale received majority stockholder approval, but not unanimous stockholder approval. Second, there were situations where the directors acted unilaterally, without obtaining any level of stockholder approval.

---

[2] 3 Seymour D. Thompson & Joseph W. Thompson, *Commentaries on the Law of Private Corporations* § 2417, at 335 (2d ed. 1909) ("Where there are no creditors, and no stockholder objects, a corporation, as against all other persons but the state, may sell and dispose of all its property."); *accord* Henry Winthrop Ballantine, *Ballantine on Corporations* § 281, at 666 (rev. ed. 1946) ("The general rule in the absence of statute has been declared to be that such a disposition of assets or a dissolution may be restrained on the objection of a single shareholder.").

[3] *See* Injunction Decision, 250 A.3d at 1033 n.6; *see also* Sam Glasscock III, *Ruminations on Appraisal*, 35 Del. Law., Summer 2017, at 8; Charlotte K. Newell, *The Legislative Origins of Today's Appraisal Debate*, 35 Del. Law., Summer 2017, at 12–13.

[4] *See, e.g.*, *Stephenson v. Commonwealth & S. Corp.*, 168 A. 211, 213 (Del. 1933) (referring to historical holdup problems caused by unanimity rule for mergers); Robert B. Thompson, *Exit, Liquidity, and Majority Rule: Appraisal's Role in Corporate Law*, 84 Geo. L.J. 1, 12–13 (1995) (discussing same).

When seeking to justify a failure to comply with the common law's unanimity requirement, the proponents of a non-compliant sale generally advanced two lines of argument. If the corporation had a charter provision that authorized the proponents to proceed without unanimous stockholder approval, such as a provision only requiring majority stockholder approval or authorizing the directors to sell the assets, then the proponents invoked that authority. If the corporation was failing or insolvent, then the proponents argued that the corporation's condition obviated the need for unanimous stockholder approval.

When considering whether a corporation's condition obviated the need for unanimous stockholder approval, the common law distinguished between (i) an unprofitable corporation and (ii) a failing and insolvent corporation. If the corporation's business was unprofitable, then the directors could sell its assets with the approval of a majority of the stockholders. In that setting, the treatises and cases explain that the minority could not force the majority to continue to operate a money-losing business that eventually would reach the point of failure. If the business was insolvent, then the directors could sell its assets unilaterally, without any level of stockholder approval. The directors also could effectuate an assignment for the benefit of creditors or declare bankruptcy.

Treatises on corporate law distinguish consistently between (i) an unprofitable corporation, where the directors can sell the assets with majority stockholder approval, and (ii) a failing and insolvent corporation, where the directors could sell the assets unilaterally, without any level of stockholder approval. For example, a widely cited treatise from the beginning of the twentieth century explains:

16

**§ 111. Sale of Entire Property of a Losing Corporation by Majority Vote.** — The general rule that a majority cannot sell the entire assets of a prosperous corporation is based upon the principle that a majority cannot control corporate powers to defeat corporate purposes. It is subject to the exception—noted in the last section—that such a sale may be made as a step towards dissolution.

The power of a majority to dispose of all the property of a *losing* corporation, however, is in furtherance of the purposes of the corporation and arises *ex necessitate*.

When the further prosecution of the business of the corporation would be unprofitable, it is the duty, as well as the right, of the majority to dispose of its property and take action towards the liquidation of its affairs.

**§ 112. Sale of Entire Corporate Property By Directors.** — The directors of a corporation are appointed to manage its affairs. They have implied authority to acquire and dispose of its property in the usual course of business. They have no right to take any action which will thwart the purpose for which the corporation was created.

The powers of directors are defined by the charter and by-laws of the corporation. The extraordinary power of disposing of the entire corporate assets *might* be conferred upon them. But, unless expressly conferred, the directors of a prosperous corporation have no power to sell out its entire property and deprive it of a means of continuing business. And the directors of a losing, but not insolvent, corporation are equally without implied authority to wind up its affairs and dispose of its assets.

The distinction between a losing corporation able to pay its debts and an insolvent corporation must be observed. The transfer of the entire property of the one involves primarily the relations between a corporation and its stockholders; of the other, the relations between a corporation and its creditors. As said by Judge Peckham in *Vanderpoel v. Gorman*: "The assignment of property by an insolvent corporation to pay its debts is a very different action from so disposing of its property when solvent, as to make its continued exercise of its franchises impossible."

In the absence of a controlling statute or by-law of the corporation, the directors have power to authorize an assignment of the property of an insolvent corporation for the benefit of its creditors.

17

Walter Chadwick Noyes, *A Treatise on the Law of Intercorporate Relations* §§ 111, 112, at 210–13 (rev. 2d ed. 1909) (footnotes omitted). A leading mid-century treatise similarly explains that "[i]f a corporation is *insolvent or in failing condition*[,] the board of directors have authority to sell the entire assets in order to pay the debts and avoid the sacrifice of an execution sale[,] even without the vote or consent of the shareholders," but that in "*other less urgent circumstances . . .* the directors may sell and dispose of the assets without authority of statute, *at least with the concurrence of majority shareholders*, where a sale is required by the exigencies of the business as where there is no reasonable prospect of being able to continue the business profitably." Ballantine, *supra*, § 281, at 667 (emphases added)).

When a modern reader looks at common law cases, it is important to keep these distinctions in mind, because they provide insight into the specific language that the cases use. They also explain why some decisions focus on certain issues and not others. For example, if a sale of assets obtained majority stockholder approval, then the court did not need to address whether the corporation's condition was sufficiently dire that the directors alone would have had authority to effectuate the sale. Likewise, if the directors did not obtain majority stockholder approval, then the court did not need to address whether majority stockholder approval rather than unanimous stockholder approval would have been sufficient to approve the sale.

The Injunction Decision addressed a transaction in which the directors of a failing and insolvent corporation agreed to transfer all its assets to satisfy the claims of its secured creditors and avoid an execution sale. In analyzing this issue, the Injunction Decision

18

focused on the exception to the common law rule under which directors could sell a corporation's assets without any level of stockholder approval. The court admittedly did not compare and contrast this exception with the line of authorities addressing when a corporation could sell its assets with majority stockholder approval.

Stream now contends that the court misapprehended the exception to the common law rule, which Stream claims only permitted a sale of assets with majority stockholder approval. To advance that argument, Stream cleverly quotes passages that reference the ability of a corporation to sell assets with majority stockholder approval. But those authorities neither conflict with nor negate other exceptions to the common law rule, including the exception that permitted a corporation's board of directors to act unilaterally without obtaining any level of stockholder approval if the firm was insolvent and failing.

As discussed in the Injunction Decision, numerous authorities make clear that under the common law, the board of directors of an insolvent and failing firm had the authority to sell all of its assets without stockholder approval, particularly if the transaction would avoid an execution sale. As one treatise explains, "[i]t is within the dominion of the managing officers and agents of the corporation to dispose of all the corporate property under certain circumstances; and this may be done without reference to the assent or authority of the stockholders." Thompson, *supra*, § 2418, at 336. Elsewhere, the same treatise reiterates the exception: "Where the corporation is in failing circumstances or is in fact insolvent, the directors and managing officers may dispose of all the property, or make an assignment of all the corporate property for the benefit of creditors." *Id.* § 2429, at 351.

19

The Injunction Decision cited additional treatises that say the same thing.[5] The Injunction

Decision could have cited others.[6] A modern treatise summarizes those authorities as

[5] *See, e.g.*, Ballantine, *supra*, § 281, at 667 ("If a corporation is insolvent or in failing condition[,] the board of directors have authority to sell the entire assets in order to pay the debts and avoid the sacrifice of an execution sale[,] even without the vote or consent of the shareholders." (footnote omitted)); 1 Charles Fisk Beach, Jr., *Company Law: Commentaries on the Law of Private Corporations* § 357, at 582 (1891) (noting that for "a failing company the rule is different, and sale of the whole property may be made by the directors"); Thomas Conyngton & R.J. Bennett, *Corporation Procedure* 232 (rev. ed. 1927) ("The directors may, however, without authorization of the stockholders, sell the corporate assets if necessary to pay the corporate debt, and they may, in the absence of statutory or other prohibitions, make an assignment for the benefit of the creditors." (footnote omitted)); *id.* at 232 n.27 (citing with approval *In re E.T. Russell Co.*, 291 F. 809, 817 (D. Mass. 1923), which explained that "[w]hen a corporation has reached the point of insolvency, as this corporation had, it is within the powers of the directors to provide for a distribution of its assets among its creditors, and if they elect to resort to a common-law assignment they are but taking such measures as appear to them proper to liquidate, and this, even though they may have reason to expect that their acts would become void by subsequent bankruptcy proceedings"); *id.* (citing with approval *Rogers v. Pell*, 49 N.E. 75 (N.Y. 1898), which observed that where a corporation "could not pay its debts as they matured," and where "neither statute nor by-law regulating the subject was shown, [then] the power of the corporation to make a general assignment resided in its directors").

[6] *See* Noyes, *supra*, § 112, at 213 ("In the absence of a controlling statute or by-law of the corporation, the directors have power to authorize an assignment of the property of an insolvent corporation for the benefit of its creditors."); 3 William W. Cook, *A Treatise on the Law of Corporations* § 670, at 2163 (7th ed. 1913) ("Neither the directors nor a majority of the stockholders have power to sell all the corporate property as against the dissent of a single stockholder, unless the corporation is in a failing condition."); *id.* at 2170 n.2 (citing with approval *Common Sense Mining & Milling Co. v. Taylor*, 152 S.W. 5, 10–11 (Mo. 1912), which stated that where a "corporation [was] in failing circumstances, the directors had the legal right to dispose of its assets to pay its debts"); James Hart Purdy, *Treatise on the Law of Private Corporations* § 830, at 1243 (1905) ("[A] majority of the shareholders of a prosperous corporation, cannot sell out the property and invest in other enterprises, against the wishes of the minority. Nor may the directors, even with the consent of a majority of the shareholders do so. But in [the] case of a failing company, the rule is different, and sale of the whole property may be made the directors." (footnotes omitted)); *id.* § 832, at 1245 ("A corporation, through a majority of its directors, may make a transfer

follows: "If a corporation is insolvent or in failing condition, the common law recognizes the authority of the board of directors to sell the entire assets without the vote or consent of the shareholders in order to pay the debts of the corporation and avoid the sacrifice of an execution sale." 4 James D. Cox & Thomas Lee Hazen, *Treatise on the Law of Corporations* § 22:4, (3d ed.), Westlaw (database updated Dec. 2021); *accord Insolvency or Failing Condition of Corporation*, 6A Fletcher Cyclopedia L. Corps. § 2949.50 (perm. ed.), Westlaw (database updated Dec. 2021).

The Injunction Decision noted that "[w]hen making these statements, the treatise authors relied on cases from numerous jurisdictions," and it collected examples in a footnote. 250 A.3d at 1036 & n.9. The decision could have cited additional cases, including citations drawn from additional treatises or from collections of pertinent authorities. *See, e.g.*, *Chi. Bank of Com. v. Carter*, 61 F.2d 986, 991 (8th Cir. 1932) ("Where a corporation is insolvent in the sense that it is unable to meet its current obligations, the board of directors, unless inhibited from so doing by statute, charter, or by-law provisions, without any special authority from or vote of the stockholders, has the power to make a general assignment for the benefit of creditors, or to apply for receiver, or to file a petition in voluntary bankruptcy."); *Power of Directors to Sell Property of Corporation Without*

---

of all its property in payment of one creditor, if it be done *bona fide*."); *id.* § 1207, at 1767 (stating in insolvency chapter that "the directors have the power to execute, or authorize the execution of, an assignment of all the property of the corporation for the benefit of its creditors, whenever they deem it necessary or advisable to do so. They exercise the power independent of the assent by the stockholders" (footnote omitted)).

*Consent of Stockholders*, 60 A.L.R. 1210 (1929 & Supp.) (collecting cases); *Power of Directors to Sell Property of Corporation Without Consent of Stockholders*, 5 A.L.R. 930 (1920 & Supp.) (same).

The Injunction Decision relied on *Butler v. New Keystone Copper Co.*, 93 A. 380 (Del. Ch. 1915), to demonstrate that Delaware law recognized these common law principles, including the existence of exceptions to the common law requirement of unanimous stockholder approval. *See* 250 A.3d at 1036 (discussing *Butler*). As Stream correctly points out, *Butler* did not specifically involve the insolvency-based exception that permits directors to sell all of a corporation's assets without stockholder approval. The Injunction Decision did not claim that it did. The Injunction Decision explained that *Butler* involved a corporation's attempt to rely on a charter provision that authorized the corporation to sell all of its assets with less than unanimous stockholder approval. *Id.* As the Injunction Decision noted, "Chancellor Curtis held that the charter provision was effective and denied the stockholders' application for a preliminary injunction." *Id.* at 1036 (citing *Butler*, 93 A. 380 at 381–82).

The Injunction Decision discussed the *Butler* case because it is the seminal Delaware decision on a sale of assets and formed the backdrop to the adoption of the statutory predecessor to Section 271. In his decision, Chancellor Curtis referred to the common law rule that required unanimous stockholder approval for a sale of assets and recognized that it had exceptions. He summarized the law as follows:

> The general rule as to commercial corporations seems to be settled that neither the directors nor the stockholders of a prosperous, going concern have power to sell all, or substantially all, the property of the company if the holder of a

22

single share dissent. But if the business be unprofitable, and the enterprise be hopeless, the holders of a majority of the stock may, even against the dissent of the minority, sell all the property of the company with a view to winding up the corporate affairs.

*Butler*, 93 A. at 383, *quoted in* Injunction Decision, 250 A.3d at 1036.

Stream objects that this passage only speaks explicitly about an "unprofitable" business and the ability of "the holders of a majority of the stock" to sell the property of the corporation; it does not refer to the additional exception authorizing directors to sell the assets of a failing or insolvent corporation without stockholder approval. That is both true and understandable. Chancellor Curtis was dealing with a case in which the sale of assets received a level of stockholder approval, albeit less than unanimity. He therefore focused on that exception to the common law rule of unanimity. The Chancellor was not trying to write a comprehensive treatise, and his explicit reference to one exception to the common law unanimity rule did not negate the other exceptions, including the exception that permitted directors to sell the assets of an insolvent and failing firm without stockholder approval.

Chancellor Curtis also was not dealing with an insolvent and failing firm. The company in *Butler* was not yet failing or insolvent, although the business had proven unprofitable. *Butler*, 93 A. at 383 ("[T]he directors of the [company] . . . owning only a mine and certain treasury assets, finding the mine a disappointment and that the further development of it would be unprofitable and unwise . . . ."). Chancellor Curtis therefore discussed the most pertinent exception to the common law rule: "But if the business be unprofitable, and the enterprise be hopeless, the holders of a majority of the stock may,

23

even against the dissent of the minority, sell all the property of the company with a view to winding up the corporate affairs." *Id.* at 383. A modern reader no longer steeped in the common law distinctions might infer that "hopeless" indicated that the business had failed, but it more properly refers to a situation where the business was unprofitable and could not be turned around, even though the corporation still had positive value.

To reiterate, by citing one exception to the common law rule of unanimity Chancellor Curtis did not rule out others. He notably cited two treatises—the Thompson treatise and the Cook treatise, that this decision has referenced previously. *See id.* (citing 2 William W. Cook, *A Treatise on the Law of Corporations* § 670 (6th ed. 1908) and 3 Seymour D. Thompson & Joseph W. Thompson, *Commentaries on the Law of Private Corporations* §§ 2421, 2424 (2d ed. 1909)).

The Thompson treatise provides a list of ten separate exceptions to the common law's general rule of unanimity, including the following:

> Fourth. Where the corporation is in failing circumstances or is in fact insolvent, the directors and managing officers may dispose of all the property, or make an assignment of all the corporate property for the benefit of the creditors. . . .
>
> \* \* \*
>
> Sixth. The majority stockholders, even as against the protest of the minority, may dispose of all the property when the corporate business has become unprofitable and where it would be ruinous to the corporation and the stockholders to continue the business; or when there are insufficient funds to continue the business and no money with which to pay existing indebtedness; or where the corporation is in failing circumstances or is in fact insolvent.

Thompson, *supra*, § 2429, at 351–52 (formatting added). The Thompson treatise thus recognized the existence of both exceptions.

24

The Cook treatise recognizes the dual exceptions indirectly by stating that "[n]either the directors nor a majority of the stockholders have power to sell all the corporate property as against the dissent of a single stockholder, unless the corporation is in a failing condition." Cook, *supra*, § 670, at 2163. The logical corollary of this statement is that if the corporation is in a failing condition, then the assets of the corporation may be sold either by the directors alone or with the approval of a majority of the stockholders. As discussed previously, common law cases drew a distinction between two situations: an unprofitable business, where the directors could sell the assets with the approval of a stockholder majority, and an insolvent and failing business, where the directors could sell the assets unilaterally. *See* Ballantine, *supra*, § 281, at 667; Noyes, *supra* §§ 111, 112.

The Injunction Decision cited *Butler* because Chancellor Curtis both acknowledged the baseline common law rule of unanimity and recognized that it had exceptions. The Injunction Decision relied on other authorities to demonstrate that one of the exceptions to the common law rule permitted the directors of a failing and insolvent firm to transfer assets without stockholder approval.[7]

---

[7] To the same end, the court cited a contemporary Delaware treatise as "acknowledg[ing] the 'failing business' exception to the common law rule." Injunction Decision, 250 A.3d at 1036 (citing 1 R. Franklin Balotti & Jesse A. Finkelstein, *Balotti and Finkelstein's Delaware Law of Corporations and Business Organizations* § 10.7, Westlaw (4th ed. 2021 & 2021-2 Supp.)). As Stream points out, the treatise explicitly calls out the rule that "[a]t common law, a majority of the stockholders could sell all or substantially all of the assets against the will of the minority to prevent further losses from a losing business." Balotti & Finkelstein, *supra*, § 10.7. As with the *Butler* case, the Injunction Decision cited the treatise as supporting Delaware's recognition of the common law rule

25

As the cornerstone of its current claim that the court misapprehended the authorities and that the only exception to the common law rule addressed the requisite level of stockholder approval, Stream relies on *Geddes v. Anaconda Copper Mining Co.*, 254 U.S. 590 (1921). There, the Supreme Court of the United States recognized the "general rule of law that, in the absence of special authority so to do, the owners of a majority of the stock of a corporation have not the power to authorize the directors to sell all of the property of the company and thereby abandon the enterprise for which it was organized." *Id.* at 595–96. The Supreme Court then explained that there was an exception, "as well established as the rule itself," that when

> the business of a corporation, not charged with duties to the public, has proved so unprofitable that there is no reasonable prospect of conducting the business in the future without loss, or when the corporation has not, and cannot obtain, the money necessary to pay its debts and to continue the business for which it was organized, even though it may not be insolvent in the commercial sense, the owners of a majority of the capital stock, in their judgment and discretion exercised in good faith, may authorize the sale of all the property of the company for an adequate consideration, and distribute among the stockholders what remains of the proceeds after the payment of its debts, even over the objection of the owners of the minority of such stock.

*Id.* at 596. As with *Butler*, Stream crows that this passage only refers to a sale of assets with majority stockholder approval, and Stream concludes that the exception to the common law unanimity requirement never went further than that.

_____

and the fact that it had exceptions. The Injunction Decision relied on other authorities for the substantive content of the pertinent exception.

26

Stream accurately describes the passage in *Geddes*, but draws the wrong conclusion. Like Chancellor Curtis in *Butler*, the Supreme Court in *Geddes* discussed the majority-stockholder exception to the common law unanimity requirement because it was dealing with a case in which a majority of the stockholders approved the sale. *Id.* at 591. The Supreme Court did not need to delve into other exceptions, such as the ability of a board of directors of an insolvent and failing firm to sell assets without any level of stockholder approval. And as in *Butler*, the corporation in *Geddes* was not insolvent and failing. The Supreme Court of the United States observed in its decision that the company "cannot be said to have been insolvent." *Id.* at 597. In the decision that *Geddes* reviewed, the United States Court of Appeals for the Ninth Circuit discussed the company's condition in greater detail, explaining that although the company was not yet insolvent, the minority stockholders could not force its majority stockholder to continue the business in an effort to turn it around. *See Geddes v. Anaconda Copper Mining Co.*, 245 F. 225, 233–34 (9th Cir. 1917), *rev'd on other grounds by* 254 U.S. 590 (1921).

As with *Butler*, the Supreme Court in *Geddes* cited authorities in support of its summary of the law that describe the full scope of the common law rule and its exceptions. The *Geddes* decision cited three treatises: 3 Seymour D. Thompson & Joseph W. Thompson, *Commentaries on the Law of Private Corporations* §§ 2424–29 (2d ed. 1909), 3 William W. Cook, *A Treatise on the Law of Corporations* § 670 (7th ed. 1913), and Walter Chadwick Noyes, *A Treatise on the Law of Intercorporate Relations* § 111 (rev. 2d ed. 1909). This decision has shown that each treatise also recognized that directors could sell the assets of an insolvent or failing firm without stockholder approval. As with *Butler*,

27

the fact that *Geddes* recognized one exception—the ability of the directors to sell the assets of an unprofitable but still valuable corporation with majority stockholder approval—did not negate the existence of others.

Stream is thus incorrect that the sole exception to the common law unanimity rule enabled a corporation to sell assets with only majority stockholder approval. The common law recognized that an unprofitable corporation could sell its assets with only majority stockholder approval. The common law also recognized that the directors of an insolvent or failing firm had the authority to sell the corporation's assets without stockholder approval.

Stream has presented its principal basis for appeal with considerable rhetorical skill, but this is not a matter where there is room for historical debate. The inference that Stream draws from its selective quotations falls under the great weight of common law authority.

**2.      The Effect Of Section 271**

The next question is whether Stream is likely to succeed in its contention that the General Assembly's enactment of Section 271 superseded the common law rule. Plainly it did, but only as to the level of stockholder approval required for a sale of assets on which stockholders otherwise had the right to vote. As to that issue, Section 271 lowered the requirement from unanimous approval to majority approval. Nothing about Section 271 suggests any intent to grant stockholders rights to vote that they did not already possess. Section 271 therefore did not supersede the common law's recognition that directors could sell the assets of an insolvent or failing firm without stockholder approval, particularly when doing so would avoid an execution sale.

28

When a Delaware court evaluates whether a statute supersedes a common law rule, two principles guide the analysis. First, "[t]he common law is not repealed by statute unless the legislative intent to do so is plainly or clearly manifested." *A.W. Fin. Servs., S.A. v. Empire Res., Inc.*, 981 A.2d 1114, 1122 (Del. 2009) (alteration in original) (quoting 15A C.J.S. *Common Law* § 16). Second, "any such repeal is not effected to a greater extent than the unmistakable import of the [statutory] language used." *Id.* (alteration in original) (quoting 15A C.J.S. *Common Law* § 16). "[R]epeal by implication is disfavored, and is deemed to occur only 'where there is fair repugnance between the common law and the statute, and both cannot be carried into effect.'" *Id.* (quoting 15A C.J.S. *Common Law* § 16).

The General Assembly enacted the predecessor to Section 271 in the aftermath of the *Butler* decision. *See* Injunction Decision, 250 A.3d at 1037 n.11 (collecting sources). Chancellor Curtis' summary of the common law made plain that a corporation generally would have to obtain unanimous stockholder approval for a sale of assets. *See Butler*, 93 A. at 383. Two years later, Section 271 "was enacted to invalidate the prior common law rule that prohibited the sale of all or substantially all of a corporation's assets without unanimous stockholder approval." Robert S. Saunders et al., 3 *Folk on the Delaware General Corporation Law* § 271.01, at 10-9 (7th ed. 2021). It is plain that Section 271 superseded this aspect of the common law, and SeeCubic agrees with Stream on this point.

What Section 271 did not do is go further and grant voting rights to stockholders that they did not possess under the common law. As explained by then-Vice Chancellor Strine,

29

The origins of § 271 did not rest primarily in a desire by the General Assembly to protect stockholders by affording them a vote on transactions previously not requiring their assent. Rather, § 271's predecessors were enacted to address the common law rule that invalidated any attempt to sell all or substantially all of a corporation's assets without unanimous stockholder approval.

*Hollinger Inc. v. Hollinger Int'l, Inc.*, 858 A.2d 342, 376 (Del. Ch. 2004); *accord* Balotti & Finkelstein, *supra*, § 10.1 ("Section 271 was first enacted in 1917 to supersede and mitigate the common law requirement, in most situations, of unanimous stockholder consent to the alienation of all or substantially all of the corporation's property." (footnote omitted)). "The statutory change was intended to eliminate the veto power of minority stockholders and not to limit the powers of the directors to manage the business of the corporation." Balotti & Finkelstein, *supra*, § 10.1. It follows that the statutory change was not intended to eliminate the ability of the directors of an insolvent and failing firm to sell its assets without stockholder approval, thereby giving stockholders a right to vote that they did not previously possess.

The plain language of Section 271 bears out this understanding. Section 271(a) states,

Every corporation may at any meeting of its board of directors or governing body sell, lease or exchange all or substantially all of its property and assets, including its goodwill and its corporate franchises, upon such terms and conditions and for such consideration, which may consist in whole or in part of money or other property, including shares of stock in, and/or other securities of, any other corporation or corporations, as its board of directors or governing body deems expedient and for the best interests of the corporation, when and as authorized by a resolution adopted by the holders of a majority of the outstanding stock of the corporation entitled to vote thereon or, if the corporation is a nonstock corporation, by a majority of the members having the right to vote for the election of the members of the governing body and any other members entitled to vote thereon under the certificate of incorporation or the bylaws of such corporation, at a meeting duly called upon at least 20 days' notice. The notice of the meeting shall state that such a resolution will be considered.

30

8 *Del. C.* § 271(a).

The statute plainly addresses the voting requirement for a sale of all or substantially all of a corporation's assets and provides that for a corporation with capital stock, the operative standard is a majority of the outstanding voting power. The plain language of the statute does not address any exceptions to the common law rule. It does not say anything about whether stockholder approval is required for a firm that is insolvent and failing. There is no "clear[]" legislative intent to supersede the insolvency exception. *See A.W. Fin. Servs.*, 981 A.2d at 1122. There is also no hint that the General Assembly "implicitly repeal[ed]" the insolvency exception. *See id.* (noting that "repeal by implication is disfavored," and that it only occurs if "both cannot be carried into effect" (quoting 15A C.J.S. *Common Law* § 16)).

By changing the voting standard from unanimity to a majority, Section 271 expanded the exception to the unanimity rule which permitted the majority of stockholders to approve a sale "if the business be unprofitable, and the enterprise be hopeless." *See Butler*, 93 A. at 383. After the enactment of Section 271, a sale of assets of even a profitable business could be accomplished with only majority approval. Consistent with then-Vice Chancellor Strine's observation, Section 271 limited stockholder voting rights. It did not expand them. Given the directional thrust of Section 271, it would be strange to interpret the statute as granting stockholders a voting right that they did not possess at common law.

Stream is thus incorrect in its argument regarding the effect of Section 271. More importantly, however, Stream is wrong that its argument, assuming it were correct, could carry the day. Contrary to Stream's position, the Injunction Decision did not rest

31

exclusively on the relationship between Section 271 and the common law exception. The Injunction Decision applied principles of statutory interpretation and considered multiple sources of authority in reaching the conclusion that the directors of an insolvent corporation have the power to transfer assets to secured creditors in lieu of an execution sale. The Injunction Decision canvassed dictionary definitions of the term "sale." 250 A.3d at 1040. It reviewed the development of Section 271, finding no evidence that it was ever intended to apply to a transaction that transferred collateral to a secured creditor. *Id.* at 1038–39. The Injunction Decision also examined the enactment of Section 272 as part of the comprehensive revision of the Delaware General Corporation Law in 1967, which made clear that a mortgage or pledge of corporate property and assets to secure debt would not require stockholder approval, except to the extent required by the certificate of incorporation. *See id.* at 1038. And the Injunction Decision considered the only Delaware ruling that the parties had identified—then-Vice Chancellor Strine's transcript ruling in *Gunnerman*—which held in a similar scenario that a stockholder vote was not required. Noting that *Gunnerman* stood alone, the Injunction Decision noted that given the prevalence of security interests and the fact that Section 271 and its predecessor have been around since 1917, this issue surely would have arisen if Section 271 applied to the transfer of an insolvent corporation's assets to its secured creditor. Citing the evidence of "the dog that has not barked," the court inferred that virtually no one thinks that Section 271 would apply in that context. *Id.* at 1043. For these and all of the other reasons discussed in the Injunction Decision, the court concluded that Section 271 did not require a stockholder vote on the Omnibus Agreement.

32

At best for Stream, its argument about Section 271 superseding the common law could raise a litigable question about one aspect of the Injunction Decision. Assuming Section 271 sought to occupy the field—an assumption which the circumstances surrounding its adoption, the text of the statute, and its subsequent interpretation do not support—then Stream still would have to overcome the other grounds for holding that Section 271 did not require a stockholder vote on the Omnibus Agreement. Stream has not presented meaningful argument on the latter issues.

### 3.    The Class Vote Provision

Finally, the Motion argues that the court misinterpreted the Class Vote Provision. That provision provides:

> **Separate Vote of Class B Voting Stock**. For so long as shares of Class B Voting Stock remain outstanding, in addition to any other vote or consent required herein or by law, the affirmative vote or written consent of the holders of a majority of the then-outstanding shares of Class B Voting Stock, voting as a separate class, shall be necessary for the Company to consummation [sic] an Acquisition or Asset Transfer.

Dkt. 101 Ex. 41 § IV.D.2(d). The Charter defines an "Asset Transfer" as "a sale, lease or other disposition of all or substantially all of the assets or intellectual property of [Stream] or the granting of one or more exclusive licenses which individually or in the aggregate cover all or substantially all of the intellectual property of [Stream]." *Id.* § IV.D.4(b)(ii).

As explained in the Injunction Decision, the language of this provision "tracks the text of Section 271 and warrants the same interpretation." 250 A.3d at 1044–45. The Injunction Decision therefore concluded that "[t]he transaction contemplated by the

33

Omnibus Agreement, in which Stream agreed to transfer its assets to its secured creditors, does not implicate the Class Vote Provision." *Id.* at 1045. The Injunction Decision did not foreclose the ability of corporations to include provisions in their certificates of incorporation that would require some form of stockholder vote for a transaction in which the directors of a failing and insolvent firm transferred assets to satisfy the claims of secured creditors. Such a provision, however, should be clear, and it should give fair notice to all corporate constituencies, including creditors, that the pertinent stockholders would possess that right. The Class Vote Provision does not do that.

## E.     The Balancing Of The Factors

For the reasons discussed in the prior section, the first *Kirpat* factor does not weigh in favor of granting a stay. The second *Kirpat* factor favors a stay mildly. The third *Kirpat* factor counsels against a stay, and to a greater degree than the second *Kirpat* factor favors one. The fourth *Kirpat* factor was neutral. Evaluating the factors as a whole, a stay is unwarranted. Rather than maintaining the status quo, a stay would be likely to upset it. Consequently, to the extent the Motion seeks a stay pending appeal, that request is denied.